**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL BRUCE WILKINSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-2871 |
| | ) | |
| ACXIOM CORPORATION | ) | **JURY DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

**NOW COMES** Plaintiff, Michael Bruce Wilkinson, by and through the law firm of Axley Brynelson, LLP, by Attorneys Michael J. Modl, Donald J. Murn, Justin H. Lessner, and Danielle E. Baudhuin, and as and for his Complaint against Defendant, Acxiom Corporation, alleges and shows to the Court as follows:

## NATURE OF COMPLAINT

1.     This is an action for breach of contract, breach of the implied duty of good faith and fair dealing, failure to pay earned wages in violation of the Illinois Wage Payment and Collection Act ("Act"), 820 ILCS 115/1 *et seq.*, retaliatory discharge in violation of the Act, conversion, and unjust enrichment.

## PARTIES

2.     Plaintiff, Michael Bruce Wilkinson, is an adult citizen of the state of Illinois currently residing at 1775 Tallgrass Lane, Lake Forest, Illinois, 60045.

3.     Defendant, Acxiom Corporation, is a citizen of the state of Delaware, incorporated under the laws of such state, with its principal place of business in Little Rock, Arkansas.

1

4.     Defendant is engaged in substantial business within the state of Illinois and has an Illinois office located at 1501 Opus Place, Downers Grove, Illinois, 60515 and 318 West Adams Street, Chicago, Illinois 60606.

5.     Defendant's registered agent for service of process in the state of Illinois is CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, Illinois, 60604.

## JURISDICTION & VENUE

6.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     Venue is proper in this Court under 28 U.S.C. § 1391 because it is the district court for the district within which Plaintiff was recruited, interviewed, and hired by Defendant, the district in which Plaintiff lived and worked during the entire period of his employment with Defendant, the district within which he was subsequently terminated from employment by Defendant, and the district within which a substantial part of the other events or omissions giving rise to the claims occurred.

## FACTS

### Nature of Acxiom's Business

8.     Defendant is a publicly traded company on the NASDAQ Stock Exchange.  Its trading symbol is ACXM.

9.     In its 2015 Annual Report, Defendant describes the nature of its business as follows:

> Acxiom is an enterprise data, analytics and software as a service company that uniquely fuses trust, experience and scale to fuel data-driven results. For over 40 years, Acxiom has been an innovator in harnessing the most important sources and uses of data to strengthen connections between

2

people, businesses and their partners. Utilizing a channel and media neutral approach, we leverage cutting-edge, data-oriented products and services to maximize customer value. Every week, Acxiom powers more than a trillion transactions that enable better living for people and better results for our 7,000+ global clients.

10.     Defendant processes large-scale customer databases and provides information about consumers to businesses.

11.     Defendant holds itself out as a trusted marketing partner to essentially every tier-one U.S. bank and card issuer.  In that capacity, it is entrusted with tens of millions of account-holder's first-party, confidential information including social security numbers, dates of birth, credit scores, and the like.  These financial institutions face ever-increasing scrutiny from federal and state regulators concerning the safeguarding of consumer data.

**<u>Years of Instability at Acxiom</u>**

12.     During Plaintiff's employment, Defendant struggled with its share price, market capitalization, market share, revenues, and earnings.  In the last several years, Defendant has suffered through:

      a.      At least three (3) reorganizations;

      b.      Multiple business divestitures;

      c.      The failure of a home-engineered connectivity solution branded as Audience Operating Solutions ("AOS") with a price tag in the range of $60 Million;

      d.      The scrapping of AOS followed by the hurried acquisition of LiveRamp as a replacement to AOS for at least $265 Million;

      e.      Significant diminution of its share price and the loss of in excess of $1 Billion in market capitalization; and

      f.     Functionality and legal compliance issues.

13.    Defendant has now placed the future of the broader Acxiom organization on the success of its LiveRamp unit, a considerable bet, and much of its future survival, on its ability to market and sell services concerning addressable, digital multi-channel marketing. However, some of LiveRamp's functionality is questionable as to its permissible use across financial institutions where personally identifying information and federal and state privacy protections, including but not limited to the Fair Credit Reporting Act, come in to play.

14.    There have also been issues with the accuracy and/or precision of LiveRamp's functionality including lack of advertised automation (requiring dedicated FTE similar to Marketing Services Professional and Managed Services offerings), match rates, and analytics. Acxiom has received client feedback that LiveRamp is "not delivering as advertised."

**Acxiom's "AOS" Failure**

15.    In September 2013, Defendant publicly launched AOS and positioned it to "Change Marketing Forever More." Shortly thereafter, Defendant shuttered AOS development.

16.    During its Fourth Quarter 2014 Quarterly Earnings Call's Analyst Q&A, Defendant communicated a projected annual AOS revenue run rate of $60 Million per year to be achieved over 24 months. Upon information and belief, the market responded negatively and the share price dropped precipitously. Upon information and belief, the AOS technology stack was identified as unstable, market acceptance was tepid, and the LiveRamp acquisition was announced.

17.    After making at least a $325 Million outlay for AOS and LiveRamp, Defendant jettisoned the AOS brand and terminated hundreds of AOS developers as LiveRamp took center stage.

18. Defendant had struggled to promptly provide a viable connectivity solution and there was anxiety that LiveRamp may fail in the same manner as AOS.

**Plaintiff's Employment With Acxiom**

19. Defendant employed Plaintiff from August 20, 2010, until December 16, 2015.

20. Defendant assigned Plaintiff to work out of his home with regular travel.

21. Defendant initially employed Plaintiff as an Account Executive of Financial Services Strategic Accounts and most recently as a Managing Account Director in its Marketing Services business unit.

22. In an email from Defendant's then Managing Account Director Steven Heston to its Human Resources Expert Executive Deborah Pyle dated December 9, 2011, Mr. Heston acknowledges that Defendant placed Plaintiff in a role "a few years junior to his stature, experience, and abilities" and that Defendant failed to deliver on its promise to place him in a larger role at his time of hire and thereafter.

23. Mr. Heston advised Defendant that it needed to put Plaintiff in the mix for larger roles at the level of Managing Director and above.

24. Mr. Heston repeated the same concerns about Defendant's treatment as to Plaintiff in separate emails to Defendant's Chief Ethics/Legal Officer and Executive Vice President Jerry Jones and its Senior Vice President of Human Resources Cindy Childers dated January 3, 2012.

**Plaintiff's Exceptional Performance**

25. Notwithstanding Defendant's initial and subsequent failures to live up to its commitments to Plaintiff, he performed at a very high level during the entire course of his employment. For example:

   a. He generated more revenue on behalf of Defendant than almost any other similarly situated employee despite the fact that Defendant and its Marketing Services business unit generally underperformed during the same period of time;

   b. He obtained significant gross margins (profitability) across all served accounts during his employment;

   c. He was a top producer in 2014 and 2015 in terms of total contract value and fiscal year in-year realized revenues;

   d. He was the chief deal strategist for the largest contract ever signed by Defendant for which Defendant's President and Chief Executive Officer Scott Howe sent a widely disseminated "WOW for the Win!!" email on August 26, 2014, praising Plaintiff's accomplishment (a true and correct copy of Mr. Howe's email is attached hereto as **Exhibit A**);

   e. He received uniformly positive top-tier annual performance ratings including ratings of "GameChanger" in 2014 and 2015;

   f. He was recognized for providing mission critical leadership in successfully managing key relationships with Defendant's Capital One and Chase client accounts, which Defendant's management team regularly described as two (2) of its most difficult accounts, including such commentary in one (1) of Defendant's annual performance evaluations of Plaintiff as follows:

Bruce managed our corporation through an acquisition by our customer, Capital One, of HSBC's US business. Bruce did so with a grace and elegance that has kept us in the money. Frankly, our outcome with HSBC and Capital One is better than we could have expected. Bruce's fingerprints are everywhere on that deal. . . . .

Bruce has been a tremendous add to the Capital One account. Capital One as a customer is hard to deal with. Frankly, the toughest we have in the portfolio. Bruce has come onboard and has been embraced by them. That says quite a lot.

(A true and correct copy of the performance evaluation is attached hereto as **Exhibit B**.);

g. He received LeaderBoard recognition in 2014 and 2015 and a Merit Award in 2013;

h. He received merit based Acxiom Restricted Stock Unit ("RSU") awards in February 2014, November 2014, and again in September 2015 for exceptional performance as recognized and approved by the business unit's Executive Vice President, the Executive Committee, and the Board of Directors; and

i. He received recognition as a "key associate" from Defendant's Board of Directors as follows:

As one of a select number of key associates to receive these awards, this decision reflects the critical role you play at Acxiom. We all recognize the contributions you make day in and day out and thank you for your continued commitment to Acxiom and our future success.

26. In Plaintiff's last two (2) years of employment, Defendant paid to him the following compensation including base salary and incentive compensation under its pay-for-performance approach in light of his substantial and ongoing over-performance of assigned goals in contrast to Defendant's overall underperformance and shrinking revenues:

a. 2014 = Base of $157,500 and commissions of $337,500 for total compensation of $495,000.

b. 2015 = Base of $157,500 and commissions of $655,500 for total compensation of $813,000.

**Acxiom's Commission Plan Applicable to Plaintiff**

27. During Plaintiff's employment, he was eligible to earn commissions under Defendant's FY15 Account Executive Commission Plan Business Rules, Plan Terms and Conditions ("Commission Plan"). A true and correct copy of the Commission Plan applicable to Plaintiff during his employment in 2015 is attached hereto as **Exhibit C**.

28. Based upon Plaintiff's strong performance, Defendant was required to pay him substantial earned commissions under the terms of the Commission Plan.

29. On August 26, 2014, Mr. Howe distributed a "WOW for the Win!!" email congratulating Plaintiff for landing a $150 Million renewal contract with Capital One that includes 25% in incremental future revenue ("Capital One Transaction"). A true and correct copy of Mr. Howe's email regarding the Capital One Transaction is attached hereto as **Exhibit A**.

30. Mr. Howe is an employee, agent, Named Executive Officer, and representative of Defendant and his statements, including his statements set forth in **Exhibit A**, are binding upon Defendant.

31. On September 2, 2014, Acxiom Executive Vice President Nada Stirratt sent Mr. Wilkinson a handwritten note praising the strong bond he forged with Capital One leading to the largest contract ever obtained by Defendant with any client, stating:

8

Awesome job on Cap One, Bruce! Congrats on such a big win. Thank you!!

XOXO

Nada

32.     During Defendant's Fiscal Year 2015 Sales Summit, Mr. Zellner confirmed that the total value of the renewal contract on the Capital One Transaction was actually $168 Million including "$40 Million upsell conversion of a formerly uncommitted line of development dollars in an agile format . . . that's Brett [Madison] and Craig [Harrison] certified."

33.     Mr. Zellner is an employee, agent, and representative of Defendant and his statements, including his statements to Defendant's employees at its Fiscal Year 2015 Sales Summit are binding upon Defendant.

34.     Under the terms of Defendant's Commission Plan, Defendant was required to pay Plaintiff at least $1,361,000 and possibly $1,494,00 in earned commissions based upon his work on the Capital One Transaction as follows:

| Capital One Transaction | At Quota Performance | Above Quota Performance | Total Payout Due |
|---|---|---|---|
| **$37.5 million** Commission Plan Payout Component | **"Wow for the Win!!" Transaction Valuation** ($150 million renewal contract that includes 25% in incremental future revenue) | | |
| TCV | $96,000 ($4,800,000 @ 2%) | $981,000 ($32,700,000 @ 3%) | $1,077,000 |
| FYRR | $48,000 ($1,600,000 @ 3%) | $236,000 ($5,900,000 @ 4%) | $284,000 |
| Total | $144,000 | $1,217,000 | **$1,361,000** |
| **$40.0 million** Commission Plan Payout Component | **Fiscal Year 2015 Sales Summit Transaction Value** ($168 million including $40 million upsell) | | |
| TCV | $96,000 ($4,800,000 @ 2%) | $1,056,000 ($35,200,000 @ 3%) | $1,152,000 |
| FYRR | $48,000 ($1,600,000 @ 3%) | $256,000 ($6,400,000 @ 4%) | $304,000 |
| Total | $144,000 | $1,312,000 | **$1,456,000** |
| **$41.0 million** Commission Plan Payout Component | **Development SOW CW2239612 to the Amended and Restated MDP&O Agreement Transaction Value** (Five-year term @ $8,201,870 annually) | | |

| | | | |
|---|---|---|---|
| TCV | $96,000 ($4,800,000 @ 2%) | $1,086,000 ($36,200,000 @ 3%) | $1,182,000 |
| FYRR | $48,000 ($1,600,000 @ 3%) | $264,000 ($6,600,000 @ 4%) | $312,000 |
| Total | $144,000 | $1,350,000 | **$1,494,000** |

35.     To date, Defendant has paid Plaintiff $567,281 in commission payments.

36.     Defendant has wrongfully withheld and failed to pay Plaintiff's earned commissions due and owing under the Commission Plan attributable to the Capital One Transaction. Plaintiff calculates the amount of earned commissions due and owing in the amount of at least $793,719, but it could be up to $926,719, plus interest and attorneys' fees.

37.     In an email to Plaintiff dated July 6, 2015, Defendant's Corporate Counsel CB Blackard asked Plaintiff, "Any chance they are going to stiff you on this?" in reference to Defendant's failure to pay Plaintiff his earned commission due and owing under the Commission Plan attributable to the Capital One Transaction.

38.     Attorney Blackard is an employee, agent, and representative of Defendant and his statements, including his statements to Plaintiff are binding upon Defendant.

39.     By email correspondence dated October 13, 2015, Acxiom Group Vice President – Financial Services Strategic Accounts Phil Lore stated that it was his goal to make Plaintiff a Vice President with Defendant. That is not surprising given Plaintiff's professional accomplishments at Defendant accompanied by his management team's high praise.

40.     In the summer, fall, and winter of 2015, Plaintiff repeatedly complained to Defendant concerning its failure to pay him all of the earned commissions that were due and owing to him under the terms of the Commission Plan on the Capital One Transaction under the Act including shortly before the termination of his employment.

41. Defendant's personnel records reflect that Plaintiff's management team held him in high esteem and referred to him using the following descriptors:

> "Significantly exceeds expectations," "passionate," "willing to take whatever initiative, time or effort required to deliver optimal outcome," "simply put, he brings it every day and in every meeting," "crisp in communication," "always explains situation and deals at the appropriate level for the listener," "delivers profits," excellent job "through a tough time and through changes in leadership."

42. Plaintiff gave his best efforts to Defendant during his employment and delivered incredible results on its behalf.

43. Defendant never once engaged Plaintiff in any performance coaching, counseling, or disciplinary action.

44. Notwithstanding the foregoing, Defendant has not dealt fairly or in good faith with Plaintiff:

   a. It placed him in a lesser role than that for which it solicited him;

   b. It intentionally and unlawfully withheld earned compensation due and owing to him under its Commission Plan applicable to the Capital One Transaction;

   c. It unlawfully retaliated against him by summarily discharging him from employment without any advance notice, warning, coaching, counseling, disciplinary action, performance improvement plan, or even any notice or opportunity to respond to or address any alleged concern.

45. On December 16, 2015, Mr. Lore and Defendant's Human Resources Representative Lorna Garner engaged Plaintiff in a conference call and at that time communicated to him the termination of his employment, without any advance notice or warning, effective immediately. Immediately before and after the conference call, Mr. Lore spoke via telephone to Plaintiff outside Ms. Garner's presence and told Plaintiff that Mr. Lloyd

11

directed the termination of Plaintiff's employment "for cause" due to unspecified Chase LiveRamp issues based upon Mr. Lloyd's claim that Mr. Ireland of Chase requested that Plaintiff be removed from the Chase account.

46.     After the termination of his employment on December 16, 2015, Plaintiff retained legal counsel to represent him in claims against Defendant. Subsequently, Defendant's Attorney – Human Resources Melissa Glover told Plaintiff's legal counsel that Defendant now claims it terminated Plaintiff's employment, without cause, due to a position elimination. Ms. Glover's statement, made months after Plaintiff's termination, is not credible and is in direct conflict with Mr. Lore's above-described admissions, which he made in his capacity as an employee, agent, and representative of Defendant, contemporaneous with Plaintiff's termination.

47.     After the termination of his employment, Plaintiff requested Defendant's personnel records relating to him on multiple occasions pursuant to 820 ILCS 40/2, including in writing on:

      a.  December 28, 2015;

      b.  January 8, 2016;

      c.  February 16; 2016; and

      d.  March 30, 2016.

48.     Pursuant to 820 ILCS 40/2, Defendant was required to provide Plaintiff with the following personnel records:

> . . . any personnel documents which are, have been or are intended to be used in determining that employee's qualifications for employment, promotion, transfer, additional compensation, discharge or other disciplinary action, except as provided in Section 10.

49.     If Defendant had any records or documents upon which it relied in support of, or explaining the basis for, its decision to terminate Plaintiff's employment, then it was required to provide such records to Plaintiff pursuant to 820 ILCS 40/2.

50.     The limited personnel records that Defendant provided to Plaintiff in response to his multiple, written requests do not contain any negative information relating to him, any disciplinary documentation, or any other record describing the nature, basis, or reason for the termination of his employment.  Accordingly, any attempt by Defendant to belatedly produce any such alleged record, in this or any other legal proceeding, is not worthy of credence.  Any such concealed or undisclosed record in Defendant's possession is part of Defendant's pretext intended to cover-up intentional retaliation.

**COUNT I**
**(Breach of Contract)**

51.     Plaintiff repeats and re-alleges the allegations in all prior paragraphs, above, as if set forth in full herein.

52.     The Commission Plan constitutes a valid and enforceable contract, constituting offer and acceptance supported by consideration on both sides.

53.     Plaintiff fully performed all of his duties and responsibilities under the Commission Plan in reliance on the terms therein and satisfied any and all conditions precedent to payment.

54.     Defendant had a duty to pay Plaintiff earned commissions pursuant to the terms of the Commission Plan.

55.     Defendant materially breached the Commission Plan by failing to pay Plaintiff all of the earned commissions that are due and owing to him and particularly those relating to the Capital One Transaction.

56.     As a direct and proximate result of Defendant's material breaches of contract, Plaintiff has suffered injury and has been damaged in an amount not less than $793,719 plus interest and attorneys' fees.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

57.     Plaintiff repeats and re-alleges the allegations in all prior paragraphs, above, as if set forth in full herein.

58.     Every contract entered into contains an implied covenant of good faith and fair dealing.

59.     To the extent that Defendant alleges it had contractual discretion to change the terms of the Commission Plan and/or the commissions due and owing to him relating to the Capital One Transaction, the implied covenant of good faith and fair dealing required that Defendant exercise any such discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

60.     Defendant materially breached the implied covenant of good faith and fair dealing by exercising any alleged contractual discretion unreasonably, without proper motive, arbitrarily, capriciously, and in a manner inconsistent with the reasonable expectations of the parties, and to deprive Plaintiff of the fruits of his labor.

61.     Defendant's conduct in terminating Plaintiff's employment deprived him of the benefit of restricted stock units that Defendant awarded to him during his employment.

62.     The implied covenant of good faith and fair dealing required that Defendant not terminate Plaintiff's employment arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

14

63.     Defendant materially breached the implied covenant of good faith and fair dealing by terminating Defendant's employment without proper motive, arbitrarily, capriciously, and in a manner inconsistent with the reasonable expectations of the parties, and to deprive Plaintiff of the value of the restricted stock units that Defendant awarded to him during his employment.

64.     As a direct and proximate result of Defendant's material breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered injury and has been damaged in an amount to be determined at trial.

**COUNT III**
**(Violation of the Illinois Wage Payment and Collection Act – Failure to Pay Compensation)**

65.     Plaintiff repeats and re-alleges the allegations in all prior paragraphs, above, as if set forth in full herein

66.     At all relevant times, Plaintiff was an "employee" as defined by the Act.

67.     At all relevant times, Defendant was Plaintiff's "employer" as defined by the Act.

68.     The parties entered into an employment contract or agreement within the meaning of the Act, including the terms set forth in the Commission Plan.

69.     The Commission Plan, Mr. Howe's "WOW for the Win" email, Mr. Zellner's presentation at Defendant's Fiscal Year 2015 Sales Summit, as well as other statements and conduct of the parties, evince the parties' manifestation of mutual assent to the terms of the Commission Plan and the total contract value and fiscal year recognized revenue of the Capital One Transaction.

70.     The Commission Plan constitutes a valid and enforceable employment contract or agreement within the meaning of the Act, constituting offer and acceptance supported by consideration on both sides.

71.     Plaintiff fully performed all of his duties and responsibilities under the Commission Plan in reliance on the terms therein.

72.     Defendant had a duty to pay Plaintiff pursuant to the terms of the Commission Plan.

73.     Defendant materially breached the Commission Plan by failing to pay Plaintiff all of the earned commissions, wages, and final wages that are due and owing to him and particularly those relating to the Capital One Transaction.

74.     Defendant's material breaches of the Commission Plan constitute a violation or violations of the Act.

75.     As a direct and proximate result of Defendant's material breaches of the employment contract or agreement, and violations of the Act, Plaintiff has suffered injury and has been damaged in an amount not less than $793,719, plus interest, and attorneys' fees as provided under the Act.

## COUNT IV
### (Violation of the Illinois Wage Payment and Collection Act – Retaliatory Discharge)

76.     Plaintiff repeats and re-alleges the allegations in all prior paragraphs, above, as if set forth in full herein

77.     Defendant unlawfully discharged Plaintiff's employment in retaliation for Plaintiff's exercise of protected activity and oppositional conduct under the Act including Plaintiff's complaints to Defendant about Defendant's failure to pay him all of the earned commissions that were due and owing to him under the Commission Plan and Act relating to the Capital One Transaction.

78.     As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered, and will continue to suffer, among other harm:

16

    a.   Pecuniary harm;

    b.   Lost wages and employment benefits;

    c.   Out of pocket medical treatment and prescription expense;

    d.   Emotional distress and mental anguish, physical harm and stress, pain and suffering, and other physical and mental injuries; and

    e.   Damages to his reputation.

79.    Defendant's conduct was at all times intentional, willful, wanton, and reprehensible entitling Plaintiff to an award of punitive damages.

**COUNT V**
**(Conversion)**

80.    Plaintiff repeats and re-alleges the allegations in all prior paragraphs above as if set forth in full herein.

81.    Plaintiff, pursuant to the Commission Plan had a right to the commissions in the amount of at least $1,361,000.00 on the Capital One transaction.

82.    The time for payment to Plaintiff under the Commission Plan of the commission on Capital One transaction has passed and Plaintiff has an absolute and unconditional right to immediate possession of that portion of the commission that remains unpaid.

83.    Plaintiff has, on multiple occasions, made a demand for payment of the commission under the Commission Plan.

84.    Defendant has wrongfully and without authorization continued to assume control, dominion or ownership over the unpaid commission which is the property of the Plaintiff.

85.    The commission due to the Plaintiff Commission Plan is capable of identification and is a determinable sum.

86.     Plaintiff has suffered injury and damage as a result of Defendant's wrongful conversion, in an amount to be determined at trial.

87.     Defendant's conduct was at all times intentional, willful, wanton, and reprehensible entitling Plaintiff to an award of punitive damages in an amount reasonable and proportional to the actual and potential harm suffered by Plaintiff and to discourage Defendant and others from similar conduct.

## COUNT VI
### (Unjust Enrichment (in the alternative))

88.     Plaintiff repeats and re-alleges the allegations in all prior paragraphs, above, as if set forth in full herein

89.     Defendant unjustly retained the compensation described herein earned by and due and owing to Plaintiff, all to Plaintiff's detriment.

90.     Defendant further unjustly retained the value of the restricted stock units described herein earned by and due and owing to Plaintiff, all to Plaintiff's further detriment.

91.     Defendant appreciates and has knowledge of the benefits conferred upon it by the retention of Plaintiff's property, restricted stock units, and earned commissions, and has used those benefits and Plaintiff for its own benefit and advantage.

92.     Defendant's acts described above, and retention of such benefits, violates the fundamental principles of justice, equity, and good conscience.

93.     Defendant will be unjustly enriched at Plaintiff's expense if it is allowed to retain the benefits properly due and owing to Plaintiff.

**WHEREFORE,** Plaintiff, Michael Bruce Wilkinson, respectfully requests that the Court enter judgment in his favor against Defendant on all counts and award the following relief:

A.     Reinstatement into his employment position or, in the alternative, front pay;

18

B. Back pay;

C. Back benefits with interest including any out of pocket medical treatment and prescription expense that would have been covered by Defendant's group health insurance policy if Plaintiff had remained continuously employed;

D. Compensatory damages;

E. Future pecuniary losses;

F. Punitive damages;

G. At least $793,719 in commission payments plus liquidated damages, interest, and attorney's fees in accordance with the Illinois Wage and Payment Collection Act;

H. Plaintiff's costs and disbursements in this action, including attorney's fees allowed by law;

I. Pre-judgment interest pursuant to 815 ILCS 205/2; and

J. Such other relief as the Court deems just and appropriate including but not limited to temporary, interim, and permanent injunctive relief enjoining Defendant from engaging in the unlawful conduct described herein.

## **JURY DEMAND**

Plaintiff requests a trial by jury on all issues permitted to be tried to a jury.

Dated this 17th day of April, 2017.

        **AXLEY BRYNELSON, LLP**

        *s/ Justin H. Lessner*
        Justin H. Lessner (Illinois State Bar 6290045)
        Michael J. Modl
        Donald J. Murn
        Danielle E. Baudhuin
        Attorneys for Plaintiff
        2 East Mifflin Street, Suite 200 (53703)
        P.O. Box 1767

Madison, WI 53701-1767
Telephone: (608) 257-5661
Facsimile: (608) 257-5444
E-mail: jlessner@axley.com
E-mail: mmodl@axley.com
E-mail: dmurn@axley.com
E-mail: dbaudhuin@axley.com