**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL BRUCE WILKINSON, | ) |
| | ) Case No. 17 CV 2871 |
| Plaintiff, | ) |
| | ) Judge Joan B. Gottschall |
| v. | ) |
| | ) |
| ACXIOM CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Acxiom Corp. ("Acxiom") terminated, Michael Bruce Wilkinson ("Wilkinson"), from his job as a managing account director on December 16, 2015. Pl.'s Resp. to Def.'s Stmt. Undisputed Facts ("Resp. to SUF") ¶¶ 3, 66, ECF No. 132. Wilkinson filed this diversity suit against Acxiom, alleging claims under Illinois law for conversion, unjust enrichment, breach of contract, breach of the implied covenant of good faith and fair dealing, and two claims under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS § 115/1 *et seq*. Wilkinson claims that Acxiom underpaid his commission for a "large five-year contract" with Capital One ("the Capital One deal"). *See* Resp. to SUF ¶ 14, 15. He also alleges that Acxiom fired him in retaliation for complaining about the underpayment, in violation of § 14(c) of the IWPCA.

Before the court is Acxiom's motion for summary judgment. For the reasons given below, the court grants the motion except as to Wilkinson's retaliation claim. As to that claim, the court provides Wilkinson an opportunity to explain why summary judgment should not be granted on a ground not squarely raised in the briefing.

# I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, the nonmoving party–but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)). After "[a] properly supported motion for summary judgment" is made, the adverse party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment must "go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted). Thus, summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## II. Factual Background

The following facts are either undisputed or set forth in the light most favorable to Wilkinson. "Headquartered during the relevant time-frame in Little Rock, Arkansas, Acxiom is an enterprise data, analytics, and software as a service company that processes large-scale customer databases and serves as a marketing partner for several U.S. banks." Resp. to SUF ¶ 2 (citations omitted). Wilkinson worked as an at-will employee for Acxiom from August 20, 2010, until December 15, 2015. *Id*. ¶ 3. Acxiom paid Wilkinson a base salary plus eligible commissions. *Id*. ¶ 4.

### A. The Fiscal Year 2015 Commission Plan

The plan at issue here ("plan") set the terms and conditions of Wilkinson's commissions for fiscal year 2015. *See* Resp. to SUF ¶ 5 (citing Account Executive Commission Plan, Business Rules Plans, Plan Terms and Conditions, plan at 6, Ex. 9, ECF No. 119-9); Resp. to SAF ¶¶ 8–9. Under the plan, commissions had two "primary" components: (1) the commission on Full Year Revenue Recognition ("FYRR"); and (2) the commission on Guaranteed Total Contract Value ("TCV"). Resp. to SUF ¶ 6 (numbering added). TCV commissions were to be paid within 60 days of a contract's execution while payment for FYRR did not become due until approximately June 2015, which is presumably at or after the end of Acxiom's fiscal year. Resp. to SAF ¶ 9. The plan made Acxiom's finance department responsible for calculating the TCV and FYRR amounts. Resp. to SUF ¶ 7.

The plan defines FYRR as "[r]evenue recorded by Acxiom according to GAAP ["Generally Accepted Accounting Principles"] accounting policies during the fiscal year." Resp. to SUF ¶ 6 (quoting plan at 6). The term TCV means "[t]he portion of Total Contract Value that is committed under the arrangement by guaranteeing future revenues or providing penalties if

thresholds are not achieved or the contract is terminated." *Id.* (quoting same source) (brackets in original). A portion of the dispute here centers on whether revenue for the Capital One deal was "guaranteed" under this definition.

Acxiom also emphasizes the following disclaimer and other language in the plan:

> This plan does not alter an associate's at-will status, nor does it create, imply or mean to imply a term of employment or a contract for continued employment. This plan, in parts or in total, may be changed or cancelled at any time with or without notice.
> . . .
> The leadership team reserves the right to review extraordinary situations and make adjustments to quotas and /or payments if (a) the level of effort is inconsistent with the associate's payment, (b) the contract or project experiences overruns, or (c) a dramatic decline in client satisfaction results from a commissioned associate's actions.
> . . .
> All commission payments must be approved by the Finance Leader and Director of Total Rewards.
> . . .
> For any single commission payment above $50,000, the Finance Leader and Director of Total Rewards must approve the full amount of the commission that will be paid for the applicable contract. Based on input from appropriate senior leaders, they will consider at minimum the following criteria in determining the full amount of commission and appropriate recipients: (a) viability of client, (b) risk associated with delivering the services, (c) terms and conditions of the contract, (d) amount and timing of profit and cash expected, (e) level of effort and number of associates involved, and (f) any other unusual items associated with the contract. At its sole discretion, the leadership team may adjust the commission as well as schedule payments over a time period not to exceed the term of the contract. For any single payment above $ 100,000, the Internal Compensation Committee or their designees must approve.
> . . .
> The Internal Compensation Committee reserves the right, to the extent permitted by law, to make adjustments to targets and/or payments retroactively at any time during the fiscal year or after the end of the fiscal year. Additionally, the plan may be modified and/or cancelled, at any time, with or without notice.
> . . .
> The Internal Compensation Committee retains the right to establish minimum financial performance thresholds that must be met in order for any payment, whether based on individual or Company targets, quotas or performance metrics, to be made under the terms of this plan. . . . In case of a dispute on the interpretation or administration of this plan, the decision of the Internal Compensation Committee shall be final and binding.

Resp. to SUF ¶ 10 (quoting plan at 4–6, Ex. C, ECF No. 1-3).

**B. The 2014 Capital One Deal**

Wilkinson was a member of Acxiom's account management team for Capital One from February 2012 to July 2015. Resp. to SUF ¶¶ 12–13. He reported to Barry Zellner ("Zellner"). *Id*. ¶ 12. In 2014, Capital One agreed to a "large, five-year" contract. *Id*. ¶¶ 14–15 (not materially disputed). Of the three statements of work Capital One signed under the deal, two related to existing business, and the third, which is at issue here and was assigned to Wilkinson, covered "new business development." *Id*. ¶ 16. The parties refer to this as the "DEV SOW." *See id*.

The parties point to several statements they contend bear on the "guaranteed" revenue from the DEV SOW. Acxiom cites a spreadsheet provided to Wilkinson in January 2015, at which time Acxiom paid Wilkinson a $567,000 commission for TCV for the Capital One deal. *See* Resp. to SAF ¶ 17.

Wilkinson points to an email dated about five months earlier, August 26, 2014, from Acxiom's president, Scott Howe ("Howe"), announcing the Capital One deal as providing $150 million in revenue and "incremental revenue" of 25%. *See* Resp. to SUF ¶ 15–16. According to Wilkinson, the "incremental revenue" figure was consistent with a TCV of about $40 million, a number about double the TCV value on which his January 2015 payment was based. *See id*. ¶¶ 15–16. Wilkinson also points to an October 2014 internal sales presentation stating that the Capital One deal was worth $160 million, and the "upsell" for the deal–the amount on which Wilkinson's commission for TCV might be based–was $40 million. *See* Resp. to SAF ¶ 16 (disputed).

### C. Payment of Commission and Dispute

Again, in January 2015, Acxiom paid Wilkinson $567,281 as a commission for the TCV component of the Capital One deal. Resp. to SUF ¶ 18. Acxiom provided Wilkinson with a worksheet showing the TCV of the DEV SOW to be approximately $20 million. Resp. to SUF ¶ 19 (citing Pl.'s Ex. 25, ECF No. 135-25).

Wilkinson testified that Zellner told him that he would receive an additional payment in May 2015. In the version of the facts most favorable to Wilkinson, Zellner made statements consistent with the TCV of the DEV SOW being approximately $42 million. *See* Resp. to SAF ¶¶ 17–18 (disputed facts); *but see* Resp. to SUF ¶ 20 (Zellner testified that he initially told Wilkinson in January 2015 that he would receive no further commission). Also, Wilkinson testified that he complained to Zellner about not being paid the full commission he believed he was owed, and Zellner said that complaining to Human Resources ("HR") would be "career threatening." Resp. to SAF ¶ 19; Resp. to SUF ¶ 20. Wilkinson believed that he would receive the entire commission amount he thought he was owed in May 2015. Reps. to SUF ¶ 22.

#### 1. March–July 2015

In March 2015, Acxiom transitioned Wilkinson to a role on the Client One account that was no longer client-facing. Resp. to SUF ¶ 25. Wilkinson disputes the reasons for this step, but the dispute is not presently material. *See id*. ¶ 24.

May 2015 came and went without a further commission payment to Wilkinson. Resp. to SUF ¶ 27. In June 2015, Wilkinson called Phil Lore ("Lore"), Acxiom's Group President of Financial Services, and raised concerns about the nonpayment. Resp. to SUF ¶ 21. Wilkinson followed up with an email to Lore and Zellner dated June 22, 2015. Resp. to SAF ¶ 20.

Wilkinson asked whether he should communicate with HR or finance to resolve his concerns about the commission. *See* Pl.'s Ex. 18, ECF No. 135-18.

Meanwhile, in or around June 2015, Wilkinson was being interviewed to manage another important Acxiom account, Chase. Resp. to SUF ¶¶ 41, 44. Wilkinson sent a second follow up email inquiring about the status of his commission for the Capital One deal on July 7, 2015. Resp. to SAF ¶ 22 (citing Pl.'s Ex. 19, ECF No. 135-19); *see also* Resp. to SUF ¶ 29 (Wilkinson comments in an email to another Acxiom employee dated July 6, 2015, that he has heard "radio silence" on his questions about the commission). In his emails, Wilkinson calculated the FYRR from the Capital One deal as $3.375 million and his outstanding commission as $164,000. Resp. to SUF ¶ 30.

Lore forwarded Wilkinson's emails dated June 22 and July 7 to two Acxiom employees "in compensation" and asked whether they could provide Wilkinson with "insight on the payment of FYRR to [Wilkinson]." Resp. to SUF ¶ 31. Lore announced on or around July 15, 2015, that Wilkinson would be joining the Chase team. *Id.* ¶ 45.

On July 31, 2015, Lore received a reply stating, "The comp committee ruled that we pay the TCV amount but not the FYRR amount given the inconsistencies with the numbers and the forecast." Resp. to SUF ¶ 32 (quoting Wilkinson Dep. Ex. 6 at ACXM 94, ECF No. 119-6). The term "comp committee" refers to Acxiom's compensation committee. *See id.*

### 2. September-November

On September 1, 2015, Lore sent an email to Michael Lloyd ("Lloyd"), then Acxiom's acting president and general manager of marketing services, and Libbi Whitehurst ("Whitehurst"), Acxiom's vice president of human resources, recommending Wilkinson's promotion to managing director for the Chase account. *See* Resp. to SAF ¶¶ 23, 26; Resp. to

SUF ¶¶ 42, 47.  Lore proposed giving Wilkinson a ten percent raise.  Resp. to SAF ¶ 23.  In his email message, Lore referenced the compensation committee's decision on the Capital One deal, stating that it cost Wilkinson approximately $250,000 in commissions.  *See id*. (citing Def.'s Ex. 11 at ACXM97, ECF No. 119-11) (stating that Acxiom paid "TCV" for the Capital One deal). Lore testified that he did not know exactly what Wilkinson was paid.  *See id*. (citing Lore Dep. 84:17–85:24).  Lore's reasons for mentioning the Capital One commission are genuinely disputed.  *See id*. p 24.

Following his assignment to the Chase account, Wilkinson sent another email to Lore dated October 12, 2015.  Resp. to SAF ¶ 25 (citing Def.'s Ex. 7 at 2–3, ECF No. 119-7).  Again, with inferences favorable to Wilkinson, he complained in this email about Acxiom's mistreatment, referencing the compensation committee's decision on the Capital One deal.  *See* Resp. to SUF ¶ 50.

Lloyd emailed Lore on November 16, 2015, to say that he was not impressed with Wilkinson's handling of the Chase account.  Resp. to SUF ¶ 52 (citing Def.'s Ex. 17 at ACXM147, ECF No. 119-17) (other citation omitted).  Lloyd received emails from other unspecified employees complaining about Wilkinson's lack of engagement.  Resp. to SUF ¶ 53 (not genuinely disputed).

### 3. December

The parties agree that Wilkinson attended a meeting with Lore, Whitehurst, and other Acxiom employees on December 8, 2015.  *See* Resp. to SAF ¶ 26.  Wilkinson avers that he complained to Lore, Whitehurst, and others at the meeting that he was unhappy with the delay in receiving a full commission for the Capital One deal.  *See id*.  (Citing Wilkinson Decl. ¶ 15, Pl.'s Ex. 22, ECF No. 135-22).  According to Wilkinson, Lore responded that he would look into the

issue, and Whitehurst stated that Acxiom executives "were not walking their talk." Wilkinson Decl. ¶ 15 (internal quotations omitted). Lore testified that he does not recall Wilkinson lodging complaints like these. *See id*. (citing Lore Decl. ¶¶ 7–8). Whitehurst denies making the statements Wilkinson attributes to her. *Id*. (citing Whitehurst Decl. ¶¶ 8-11). This genuine factual dispute must be resolved in favor of Wilkinson at summary judgment.

### D. Wilkinson's Termination

Many of the facts surrounding what led to Wilkinson's termination are disputed. It is undisputed that Steve Ireland ("Ireland"), Chase's vice president of digital platforms, met with Lore and Wilkinson and expressed his dissatisfaction with an Acxiom contract. *See* Resp. to SUF ¶ 57. Ireland threatened to seek other vendors for Acxiom's services. *See id.* ¶ 55.

Why Ireland was dissatisfied is disputed. *See id*. Lore testified that Ireland's concerns did not relate to Wilkinson's performance. *See* Lore Dep. 48:9–49:2.

Lloyd learned from an internal email on December 10, 2015, that Ireland was unhappy. *See* Resp. to SUF ¶ 56 (construing genuinely disputed facts favorably to Wilkinson). Lloyd called Ireland. *Id*. ¶ 57 (undisputed that call was placed). As Wilkinson describes in his testimony, "Lloyd testified that Ireland was concerned that Acxiom's management team, which also included Phil Lore, were more interested in rapid completion of the deal to earn commissions versus putting forth the correct subject matter experts to get a good decision on their way forward." *Id*. ¶ 58 (citations omitted).

It is undisputed that "Lloyd was not a part of the Capital One team during the time when Plaintiff was on the team, he did not know the terms of the Plan, and he had no role in determining Plaintiff's commissions under the Plan." *Id*. ¶ 64. But Lloyd also knew that Wilkinson had been removed from the Capital One team. *Id*. ¶ 62 (citing Lloyd Dep. 34:5-22).

Lloyd decided to terminate Wilkinson on December 15, 2015.  *Id*. ¶ 59.  Lloyd testified that he was considering a fourth quarter reduction in force at the time, and there were no other opportunities for Wilkinson within Acxiom.  *See* Lloyd Dep. 87:1–88:4.  Lloyd told Lore of his decision to terminate Wilkinson; Lloyd testified that he referred to the termination as a "job elimination."  Resp. to SUF ¶ 65 (quoting Lloyd Dep. 150:10–14).

That same day, December 15, 2015, Lore called Wilkinson to tell him that he was being terminated; what was said on the call is disputed.  In Wilkinson's version of the call, which must be accepted as true at summary judgment, "Lore told Wilkinson that [Michael] Lloyd had a conversation with Chase and as a result of that conversation Wilkinson was being terminated."  Resp. to SAF ¶ 29 (citing Wilkinson Dep. 140:3–7).

Wilkinson points to the testimony of Sarah Mathis ("Mathis"), Acxiom's designated witness regarding any reduction in force during the relevant time period.  *See* Resp. to SAF ¶ 30; Fed. R. Civ. P. 30(b)(6).  Viewed favorably to Wilkinson, Mathis testified that she did not recall that Acxiom announced a reduction in force prior to Wilkinson's firing.  *See* Resp. to SAF ¶ 30.  Acxiom points to other portions of Mathis's deposition in which she testified that Acxiom did not have a definition of reduction in force, so "anybody who's let go could be a reduction in force."  Mathis Dep. 15:19–16:24, Def.'s Ex. 5, ECF No. 135-5.  The parties agree that before performing a reduction in force, Acxiom's HR department prepares a written risk analysis, but no such analysis was prepared here.  Resp. to SAF ¶ 34.

Finally, the parties agree that Wilkinson filed a whistleblower complaint under the Sarbanes Oxley Act.  *Id*. ¶ 38.  Acxiom filed two position statements in response to the complaint regarding Wilkinson's termination.  *Id*. (citing Pl.'s Ex. 20, 21, ECF No. 135-20, 135-21).  In both statements, Acxiom took the position that Wilkinson was terminated for

performance-related reasons; Acxiom did not mention job elimination or a reduction in force. *Id.* (citing same sources).

## III. Analysis

To begin, Wilkinson has narrowed his claims to his IWPCA claims. Acxiom moves for summary judgment on all of Wilkinson's claims, arguing that the plan did not create an enforceable contract. "Wilkinson has no opposition to the dismissal of his breach of contract, breach of implied covenant of good faith and fair dealing, and conversion claims." Resp. Opp'n Mot. Summ. J. 15, ECF No. 131. He argues, however, that genuine fact issues exist on his IWPCA claims. *See id.* at 3–15. The court dismisses all of Wilkinson's claims except his IWPCA claims as expressly abandoned at summary judgment. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (failure to delineate an argument in response to a properly supported summary judgment motion results in abandonment); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996); *see also Mach v. Will Cty. Sheriff*, 580 F.3d 495, 501–02 (7th Cir. 2009) (explaining that at summary judgment "[a] plaintiff may determine as a matter of strategy that a weak, yet non-frivolous, argument is no longer worth presenting so that he may focus the court's attention on his more meritorious claims").

The IWPCA is intended "to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation, without retaliation from employers." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016) (quoting *Byung Moo Soh v. Target Mktg. Sys., Inc.*, 817 N.E.2d 1105, 1107 (Ill. 2004)); *see also Watts v. ADDO Mgmt., LLC*, 2018 IL App (1st) 170201 ¶ 12. Wilkinson brings two IWPCA claims: (1) a claim for payment of the balance of his commission for the Capital One deal and (2) a claim for retaliatory discharge.

**A. Failure to Pay Commission**

The IWPCA requires all wages to be paid either semi-monthly or once a month. *See* 820 ILCS §§ 115/3, 115/4. "Commissions may be paid once a month." § 115/3. The IWPCA also requires "[e]very employer [to] pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." § 115/5. To establish a claim for the timely and complete payment of wages, Wilkinson must show that Acxiom owed compensation under an employment contract or agreement. *Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 568–69 (7th Cir. 2016) (citations omitted).

*1. The Fiscal Year 2015 Plan*

Acxiom argues that the fiscal year 2015 plan at issue in this case is neither an employment contract nor an agreement. The IWPCA defines "wages" as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS § 115/2; *see also Enger* 812 F.3d at 568 (citations omitted) (noting that the IWPCA defines wages "narrowly"). The definition of "final compensation" includes "wages" and, separately, "earned commissions." § 115/2.

Wilkinson has abandoned any contention that the plan created an enforceable contract. And with good reason. Under Illinois law, "[w]hen an employer's policy states expressly that it does not create contractual rights, there simply is no promise that an employee can reasonably interpret as an offer to be bound" contractually by the policy. *Sutula-Johnson v. Office Depot, Inc.*, 893 F.3d 967, 972 (7th Cir. 2018) (citing *Hanna v. Marshall Field & Co.*, 665 N.E.2d 343, 348 (Ill. App. Ct. 1st Dist. 1996)) (other citation omitted). The plan here includes ample

language, quoted above, expressly disavowing the creation of any contractual rights. *See* Resp. to SUF ¶ 10 (quoting plan at 4–6). In the absence of any contrary argument from Wilkinson, there is no basis to find that the plan is an enforceable contract. *See Sutula-Johnson*, 893 F.3d at 972 (holding that employer's commission plan did not create contractual rights; the plan "said that it was not and should not be thought of as a contract of employment other than at-will and that [the employer] in its sole discretion could amend or terminate the plan at any time for any reason without notice") (internal quotations omitted).

Although the plan here does not create a contract, the parties agree that it may potentially be enforceable under the IWPCA as an "agreement." *Cf. Sutula–Johnson*, 893 F.3d at 974 (finding no employment contract and holding that the plaintiff created genuine issue of fact on IWPCA claim for timely payment of commissions). The parties part company over whether the plan's disclaimer language makes it unenforceable as an agreement for lack of mutual assent.

Illinois courts have been clear that the IWPCA "provides an employee with remedies more expansive than a common law breach of contract action when it uses the words 'employment contract or *agreement*.'" *Zabinsky v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 1st Dist. 2004) (quoting 820 ILCS § 115/2 (West 1994) (emphasis in original); *accord Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir.2012). In contrast to the elements of an enforceable contract, "An 'agreement' . . . requires only a manifestation of mutual assent on the part of two or more persons." *Zabinsky*, 807 N.2d at 681 (citations omitted); *accord Landers-Scelfo v. Corporate Office Sys.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2d Dist. 2005).

The question of whether disclaimer language in an employee handbook or compensation plan defeats a finding of mutual assent to the handbook or plan's terms has produced a split among judges of this court. *See Wharton v. Comcast Corp.*, 912 F.Supp. 2d 655, 659–62 (N.D.

Ill. 2012) (collecting cases and discussing the split).  Wilkinson urges this court to follow *Wharton* and adopt the minority view that an employee handbook or compensation plan may be enforced under the IWPCA as an agreement despite the presence of disclaimers like those at issue here.  Mem. Opp'n Mot. Summ. J. 10, ECF No. 131.

As Acxiom notes, this court expressly declined to follow *Wharton* and adopted the majority view in *Mooney v. Wyndham Worldwide Operations, Inc.*, 2014 WL 2959270, at *2 (N.D. Ill. July 1, 2014) (Gottschall, J.).  The plaintiff in *Mooney* sued to recover commissions allegedly owed under his employer's 2007 salary plan.  *Id*.  The plan included the following disclaimer: "No statement in the Program should be construed to grant any employee an employment contract of fixed duration or any other contractual rights, nor should this Program be interpreted as creating an implied or an expressed contract of employment or any other contractual rights between [the employer] and its employees."  *Id*.  Surveying cases in this district on the issue, this court found persuasive "[t]he majority view in this district [which is] that such a written disclaimer dissolves a claim under the IWPCA."  *Id*.  (collecting cases).  This court reasoned that, in light of the disclaimer, the plan's "provisions are merely guidelines that leave [the company] with sole discretion to interpret and resolve conflicts about the [plan]'s meaning, regardless of whether its employees agree or are even consulted about the changes. Accordingly, the [plan] does not provide the requisite manifestation of mutual assent to support even the broader interpretation of an agreement that governs in the IWPCA context."  *Id*. at *2 (quoting *Brand v. Comcast Corp.*, 2012 WL 5845639, at *3 (N.D. Ill. Nov. 19, 2012)) (first alteration in original), *on reconsideration Brand II*, 2013 WL 1499008 (N.D. Ill. Apr. 11, 2013).

Two years later, this court decided another IWPCA case.  Again, the court expressly adopted the majority rule and declined to follow *Wharton*.  *Jenkins v. White Castle Management*

*Company*, 2016 WL 5476234, at *12 (N.D. Ill. Sept. 29, 2016) (Gottschall, J.); *see also Brand II* at *4–5 (declining to reconsider adopting the majority view in light of *Wharton*).

Wilkinson offers the court no sufficient reason to depart from the majority view today. He does not attempt to distinguish *Mooney*. *See* Mem. Opp'n Mot. Summ. J. 9–10 (not citing *Mooney* despite Acxiom's citation in its opening brief). Besides *Wharton*, Wilkinson cites one case, which the court finds readily distinguishable. *See id*. Wilkinson relies on *Perman v. ArcVentures, Inc.*, 554 N.E.2d 982, 987 (Ill. App. Ct. 1st Dist. 1990), to show that the plan's disclaimer does not necessarily make it unenforceable. *Id*. But *Perman* involved a breach of contract claim, not an IWPCA claim to enforce an agreement. *See id*. The plaintiff in *Perman* brought a breach of contract claim based on an employee handbook, and the case turned on the interaction between a general disclaimer in the handbook and specific language establishing a pre-termination process. *See id*. Unlike the pre-termination process in *Perman*, the plan here unambiguously gives Acxiom discretion to decide whether, and to what extent, to pay commissions. *See* Resp. to SUF ¶ 10 (citing plan at 4-6 Ex. C, ECF No. 1-3) (retaining "sole discretion" to set commission over $100,000 and permitting modification of the plan "at any time"). As in *Mooney* and cases like it, Acxiom's reservation of complete discretion over setting the commission for the Capital One deal does not manifest assent to be bound by the plans' terms.[1]

---

[1] Wilkinson also cites a regulation interpreting the IWPCA. *See* 56 Ill. Admin. Code § 300.45 (West 2020). The regulation states that a disclaimer "does not preclude an agreement by two or more persons regarding terms set forth in [an employee] handbook relating to compensation *to which both have otherwise assented." Id.* (emphasis added); *see also Watts v. ADDO Mgmt., LLC*., 2018 IL App (1st) 170201, ¶¶ 18–19 (looking to regulations to interpret IWPCA). This court has no quarrel with this proposition, so far as it goes. As explained in the text, however, the evidence of assent, other than the plan itself, cited by Wilkinson does not create a fact issue on whether Wilkinson and Acxiom otherwise agreed to a particular commission payment. *Cf. Carrasco v. Freudenberg Household Products LP*, 2019 WL 5456145, at *3 (N.D. Ill. Oct. 24, 2019) (reasoning that plaintiff could establish an agreement by showing that the employer "made . . . the same promise as that contained in the employee handbook."

### 2. Other Statements

Besides the plan, Wilkinson points to three statements made by Acxiom employees about the Capital One deal to show that Acxiom agreed to pay him a larger commission. Wilkinson must point to facts "showing mutual assent to terms that support the recovery" he seeks. *Landers-Scelfo*, *supra*, 827 N.E.2d at 1059. This requires evidence of an "unequivocal promise" to pay him a specific commission for the Capital One deal or to base the commission on a TCV of $40 million. *See Schultze v. ABN AMRO, Inc.*, 2017 IL App (1st) 162140, ¶ 24.

Wilkinson characterizes three statements made prior to January 2015 as "consistent" with valuing the TCV of the Capital One deal at about $40 million, and, therefore, paying him a larger commission. *See* Resp to SAF ¶¶ 14–17. As Wilkinson's characterization suggests, none of these statements, even viewed favorably to Wilkinson, constituted an unequivocal promise.

Acxiom's president made the first statement in a company-wide email on August 26, 2014. Pl.'s Ex. 11, ECF No. 135-11. The message, which appears to announce the Capital One deal, describes the deal as having $150 million in revenue with 25% "in incremental revenue." *Id*. The email congratulates Wilkinson and others involved in the deal by name, but even read generously, it does not mention the commission or commit Acxiom to anything. *See id*.

Second, in October 2014, Zellner, Wilkinson's supervisor, gave an internal presentation showing the "upsell" figure for the Capital One deal to be "40 million+." Resp. to SAF ¶ 16 (citing Pl.'s Zellner's Dep. 99:6-13, Pl.'s Ex. 4, ECF No. 135-4 (other citations omitted). Zellner testified that the numbers he used had not yet been verified by Acxiom's finance department, and the $40 million+ figure represented the "upper bound" of the revenue he hoped Acxiom would receive. Zellner Dep. 99:3-5, 181:1-7, Pl.'s Ex. 4, ECF No. 135-4. Regardless of Zellner's thinking about the presentation (which may not be relevant to the question of an objective

manifestation of assent), he did not make any promises regarding the commission for the Capital One deal, much less an unequivocal one. *See* Pl.'s Ex. 12, ECF No. 135-12 (including clip art of a bank vault opening).

Finally, Wilkinson testified that he asked Zellner what he would be paid as a commission for the Capital One deal and, with favorable inferences, Zellner responded that Wilkinson should look forward to a $1.4 million payment. *See* Resp. to SAF ¶ 17. Wilkinson testified that Zellner made this statement "prior to" January 2015, when finance calculated his TCV payment of approximately $567,000 for the Capital One deal. Wilkinson Dep. 75:5-24, ECF No. 135-1.

Taken in the light most favorable to Wilkinson, these statements do not permit a finding of mutual assent for two, related reasons. First, all three statements were made before Acxiom calculated the TCV for the Capital One deal in January 2015. Because none of the statements mentions the commission calculation, Wilkinson argues that they are "consistent" with computing the TCV of the Capital One deal as about $40 million. *See* Resp. to SAF ¶¶ 14–16. Seen in a light favorable to Wilkinson then, Howe and Zellner's statements at most predicted, in nonspecific terms, of how the compensation committee would evaluate the Capital One deal. *See id.* Put simply, "opinion or prophecy is not a promise." *Martino v. MCI Commc'n Servs., Inc.*, 2008 WL 4976213, at *8 (N.D. Ill. Nov. 20, 2008) (quoting *Stringer Const. Co., Inc. v. CHA*, 563 N.E.2d 819, 825 (Ill. App. Ct. 1st Dist. 1990)) (holding, on promissory estoppel claim, that "interpretation[s]" of the value of a deal and "projection[s]" did "not amount to a clear and definite promise–unambiguous in its terms—that [the employer] would pay [the plaintiff] [specific] commissions").

Second, the parties agree that Acxiom's compensation committee, of which Zellner and Howe were not members, determined what commission would be paid under the express terms

of the (unenforceable) plan here. *See* Resp. to SUF ¶ 10–11 (citing plan at 4–6) ("... Plan defined Internal Compensation Committee as the Chief Financial Officer, the VP of Finance, the SVP and VP of Human Resources, and the Director of Total Rewards").

Wilkinson's testimony and conduct demonstrate that he understood that Howe and Zellner could not make unequivocal promises binding Acxiom to a particular commission amount. *See Brown v. DS Servs. of Am., Inc.*, 246 F.Supp.3d 1206, 1222–23 (N.D. Ill. 2017). According to Wilkinson's testimony, after he received his TCV payment in January 2015, he asked Zellner about the possibility of pursing his grievance about his commission with HR. *See* Resp. to SUF ¶ 20; Resp. to SAF ¶ 20. Zellner responded that it would be "career threatening." Resp. to SUF ¶ 20 (citing Wilkinson Dep. 79:1-9). Wilkinson testified that he decided to "take this chance" and called Lore. Wilkinson Dep. 79:1-9. Later, in June 2015, Wilkinson pursued the matter by emailing Zellner and Lore and asked whether he should contact HR or the finance department to bring the commission issue to "closure." Resp. to SUF ¶ 21; Resp. to SAF ¶ 20 (quoting email dated June 22, 2015, Pl's Ex. 18, ECF No. 135-18). Wilkinson asked Lore and Zellner for a status on July 7, 2015, and Lore forwarded Wilkinson's email to employees in HR. Resp. to SAF ¶ 22; Resp. to SUF ¶¶ 30–31. Wilkinson received a final decision from the compensation committee by email on July 31, 2015: "the comp[ensation] committee ruled" that the TCV for the Capital One deal would stand due to "inconsistencies with the numbers." Resp. to SUF ¶ 32 (citing Lore Dep. 140:2-17, Ex. 2, ECF No. 135-2). These activities show that Wilkinson was proceeding on the understanding that he had to go to HR, finance, and Acxiom's compensation committee to obtain a binding decision. Based on this evidence of Wilkinson's conduct, which is either undisputed or taken in the light most favorable to Wilkinson, no reasonable jury could find Howe and Zellner's earlier comments to constiue mutual assent.

"Employers and employees may manifest mutual assent by conduct alone, including past practice." *Schultze v. ABN AMRO, Inc.*, 2017 IL App (1st) 162140 ¶ 23 (citations omitted).

## B. Retaliation Claim

Section 14(c) of the IWPCA provides private plaintiffs with the right to bring a claim for retaliatory discharge. *See* 820 ILCS § 115/14(c) (2014). Under the IWPCA, an employer may not "discharge[] or in any other manner discriminate[] against any employee because that employee has made a complaint to his employer . . . that he or she has not been paid in accordance with the provisions of this Act." *Id.*

Acxiom argues that Wilkinson's retaliation claim fails for the same reason as his claim for payment of a commission: he has failed to create a fact issue on the existence of a contract or agreement. Mem. Supp. Mot. Summ. J. 13, ECF No. 117. The parties' briefing on this issue is very unhelpful.

Acxiom cites three cases to establish the proposition that a statutory retaliation claim under the IWPCA requires a contract or agreement. But none of the cases Acxiom cites involved a retaliation claim under § 14 of the IWPCA. *See Enger*, *supra*, 812 F. 3d at 568–69 (claim for "indirect wages" implied in taxi cab drivers' employment agreement); *Stark v. PPM Am., Inc.*, 354 F.3d 666, 672 (7th Cir. 2004) (claim for payment of a bonus); *Dominguez v. Micro Ctr. Sales Corp.*, 2012 WL 1719793, at *1 (N.D. Ill. May 15, 2012) (overtime pay).

Wilkinson's response provides no more help. He contends that Acxiom "'misapprehends" the governing law. Mem. Opp'n Mot. Summ. J. 1, ECF No. 131. He asserts that "[i]f Wilkinson had a reasonable good faith belief that Acxiom's conduct violated the law, that is adequate to establish protected conduct." *Id*. at 1–2. Yet Wilkinson cites absolutely no legal authority on what the law is. *See id*. Nor does he attempt to analyze the statute (neither

does Acxiom); his argument consists of three sentences and no citations. *See id.* Wilkinson's argument concludes with the factual assertion that he held a good faith belief that he was owed the commissions, but again, he does not cite the Local Rule 56.1 fact statements or anything else. *See id.*

Through independent research, the court has located cases in this district that appear to be on point. In *Reid v. Neighborhood Assistance Corp. of America*, Judge St. Eve acknowledged a dearth of case law on whether an IWPCA retaliation claim requires the plaintiff to establish an enforceable employment agreement or contract. 2013 WL 1087557, at *8 (N.D. Ill. Mar. 14, 2013) (treating issue as question of first impression). Summary judgment was entered for the employer "because Plaintiffs . . . failed to present any evidence that the complaints related to overtime allegedly owed to them pursuant to a contract or agreement." *Id.* at *9. That is, proof of an enforceable agreement or contract was required to sustain an IWPCA retaliation claim. *Id.* Other federal courts in Illinois have reached similar conclusions, and this court has been unable to locate any appellate authority on point or any contrary authority. *See Williams v. Keystone Peer Review Org., Inc.*, 2019 WL 1177951, at *4–5 (N.D. Ill. Mar. 13, 2019); *Hoffman v. RoadLink Workforce Sols., LLC*, 2014 WL 3808938, at *5 (N.D. Ill. Aug. 1, 2014); *Barker v. Atl. Pac. Lines*, 2013 WL 4401382, at *9 (N.D. Ill. Aug. 14, 2013) (Lefkow, J.) (same, dismissing IWPCA claim at the complaints stage).

Because both parties failed to cite any controlling or persuasive authority, waiver arguments could be made. In view of the authority the court has located, however, the most prudent thing to do is to invoke the process for granting summary judgment on a ground not raised by the parties. *See* Fed. R. Civ. P. 56(f); *Lynch v. N.E. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 910–11 (7th Cir. 2012). Before entering summary judgment for a reason not raised by

a properly supported summary judgment motion, the court must provide the parties with "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). Accordingly, Wilkinson will be given an opportunity to tell the court why, based on the authority cited in the previous paragraph, summary judgment should not be granted on his IWPCA retaliation claim.[2]

## IV. Conclusion

For the reasons stated, Acxiom's motion for summary judgment is granted in part. All claims are dismissed with the exception of Wilkinson's IWPCA retaliation claim. Wilkinson has twenty-eight days (April 20, 2020) to tell the court why summary judgment should not be entered on his IWPCA retaliation claim.

Dated: March 23, 2020

_____/s/_____
Joan B. Gottschall
United States District Judge

---

[2] The court declines to reach Acxiom's alternative arguments on the retaliation claim. If Wilkinson avoids summary judgment on the grounds the court is raising, Acxiom's alternative will be addressed.